**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH P. NOLFF, ANDREW TATE and BRUCE PALENSKE, Individually and On Behalf of All Others Similarly Situated, | CASE No.: 1:21-cv-04323-VM |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | CLASS ACTION |
| ATERIAN, INC., YANIV SARIG, FABRICE HAMAIDE, and ARTURO RODRIGUEZ, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Lead Plaintiff Joseph P. Nolff and named plaintiff Bruce Palenske ("Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their amended complaint against Defendants Aterian, Inc. ("Aterian" or "Company"), Yaniv Sarig ("Sarig"), Fabrice Hamaide ("Hamaide") and Arturo Rodriguez ("Rodriguez" and together with Aterian, Sarig and Hamaide, "Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation it conducted by and through their attorneys, which included, among other things, a review and analysis of: (i) Defendants' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) public reports and news articles; (iii) transcripts of Defendants' conference calls; (iv) interviews with former employee[1] witnesses with relevant information; and (v) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are

---

[1] All former employees ("FEs") are referred to in the masculine to preserve their anonymity.

known only to Defendants or are exclusively within their control or custody. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the common stock of Aterian, Inc. ("Aterian" or the "Company") between December 1, 2020 and May 3, 3021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      During the Class Period, Defendants represented Aterian as a rapidly growing technology-enabled consumer products company. Aterian claimed it would "disrupt and scale the business model of consumer-packaged goods" due to its purportedly proprietary platform AIMEE that, Defendants claimed, possessed artificial intelligence and machine learning capabilities. Defendants claimed that relying on AIMEE, Aterian could rapidly and successfully identify new product opportunities and to launch, market and sell products, faster than the traditional brick-and-mortar consumer product vendors.

3.      Unbeknownst to investors, however, Defendants materially misrepresented AIMEE and its capabilities. AIMEE was not robust artificial intelligence but an excel spreadsheet. Aterian was not an artificial intelligence company but a consumer packaged goods ("CPG") company, like other vendors that sold consumer products on e-commerce websites such as Amazon and Walmart. AIMEE did not possess any of the represented abilities of "rapid opportunity identification and

automated online sales and marketing of consumer products."  Not only did AIMEE not help Aterian grow its own core business—selling CPG—but Aterian customers who purchased access to AIMEE as software-as-a-service ("SaaS")/platform-as-a-service ("PaaS") also found that AIMEE failed to deliver any intelligent services. Instead, Aterian employees manually analyzed the data collected by and stored in AIMEE to determine the product trends, what products they need to manufacture and how to market Aterian products.

4.    In fact, Defendants increased sales materially through illicit practices – paying professionals to post fake positive reviews and giving customers free or heavily discounted products in exchange of positive reviews. Amazon, for example, bans these practices, subjecting Aterian's product to suspension or removal from Amazon's platform.

5.    Unable to leverage AIMEE to sustain and grow its revenue organically, Aterian began acquiring CPG companies so that Aterian could mask the failure of Aterian's core business and inflate its revenue in the short term.

6.    At the same time, Aterian insiders (including Defendant Sarig), harboring all the negative inside information, sold over $36.3 million worth of their Aterian holdings during the Class Period. These insiders also provided misleading information to investors by disclosing only 10 out of the total 66 Class Period trades within two days of their transactions pursuant to SEC rules. They withheld information on the remaining trades – which accounted for 72.8% of the entire profits – until after the Class Period, when they filed amendments to their initial disclosures.

7.    On May 4, 2021, Culper Research published a report Aterian, entitled: "Aterian (ATER): Bought from Felons & Fraudsters, Sold to You" (the "Culper Report"), exposing that AIMEE was not artificial intelligence and Aterian was not an A.I. company. Relying on information from former Aterian employees, the Culper Report also exposed that AIMEE was

merely "3 or 4 very smart people with Monster Energy drinks using a computer," unable to intelligently predict the trend or project inventories as the Company had advertised; that Aterian customers complained about AIMEE's inability to evaluate data as the Company had sold them to as the SaaS/PaaS service. Having extensively researched on Aterian's financials and interviewed former Aterian employees and customers, the Culper Report concluded that that Aterian misrepresented AIMEE's functionality and the nature of the Company; that Aterian used acquisitions to obscure the fact that the Company's core business was failing to produce. The Culper Report therefore took a short position on Aterian's stock.

8.      Following the Culper Report, on May 5, 2021, Aterian published a press release denying the allegations in the Culper Report. Although Aterian still claimed AIMEE as a leading technology-enabled software platform in the press release, Aterian stopped claiming AIMEE as having artificial intelligence. In fact, Aterian did not deny the Culper Report's allegation that AIMEE was not artificial intelligence. Nor did Aterian deny the Culper Report's allegation that Aterian's SaaS/PaaS services had failed.

9.      During the class period, the insiders sold large blocks of their Aterian holdings at time and in amounts that were suspicious, withholding the extent of these sales from the market until after the class period.

10.     In response to the Culper Report, the price of Aterian stock fell from its May 3, 2021, close price of $20.66 to a May 5, 2021, close of $15.72 per share, a two-day drop of $4.94 per share or approximately 24% with unusually high daily trading volumes.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because certain of the acts and conduct complained of herein, such as the trading of Aterian common stock on Nasdaq, occurred in this District.

14.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

15.    Lead Plaintiff, as set forth in the certification previously filed with this Court and incorporated by reference herein, acquired Aterian common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.    Named plaintiff Bruce Palenske purchased Aterian common stock at artificially inflated prices during the Class Period and was damaged thereby. His PSLRA certification is attached as Exhibit 1.

17.    Aterian, formerly known as Mohawk Group Holdings, Inc., is a Delaware corporation with principal executive offices located at 37 East 18th Street, 7th Floor, New York NY 10003. On June 13, 2019, Aterian completed its initial public offering ("IPO") on Nasdaq,

selling 3,600,000 shares of common stock at $10.00 per share and its shares traded under the ticker "MWK". The Company received approximately $33.5 million in net proceeds from the IPO. At the time of Aterian's IPO, none of our products have achieved the milk phase. On April 30, 2021, the Company changed its name to Aterian, Inc and its shares trade under the ticker "ATER."

18.    Defendant Sarig has served as the Chief Executive Officer ("CEO"), President, and a director of Aterian since September 2018. He is a co-founder of Mohawk Group, Inc. ("Mohawk Opco"), Aterian's single direct operating subsidiary, and has served as a director and President and Chief Executive Officer of Mohawk Opco since June 2014. Prior to co-founding Mohawk, Defendant Sarig led the Financial Services Engineering department at Coverity, a leading software startup providing code quality and security solutions for top financial institutions and hedge funds in New York including NYSE, Nasdaq, JPMC and Barclays, from April 2012 to April 2014. Before joining Coverity, Defendant Sarig held lead technical roles at Bloomberg from October 2011 to April 2012 and EPIQ Systems, Inc. (Nasdaq: EPIQ), a legal process outsourcing company, from February 2006 to October 2011. Prior to moving to New York City, Defendant Sarig lived in Israel where he held various software engineering roles at startups from various industries including companies involved in digital printing solutions and military navigation systems. Defendant Sarig holds a Bachelor of Science in Computer Science from Touro College, is fluent in English, French, Hebrew and C++.

19.    Defendant Hamaide was the Company's Chief Financial Officer ("CFO") until March 2021, at which time he transitioned roles to become the Company's Head of Mergers and Acquisitions in the European Union. Defendant Hamaide ceased serving as CFO and resigned from the Company's Board of Directors on March 8, 2021. Prior to joining Aterian, Defendant Hamaide held numerous financial, CFO and President roles in various technology and consumer

product companies in Europe and in the U.S. such as Piksel, Inc. (TV Everywhere, Over-the-Top ("OTT") SaaS) from July 2012 to March 2017, Atari (video game developer, publisher and distributer) from May 2008 to March 2010, Parrot (drone and Bluetooth consumer electronics) from November 2005 to February 2008 and Logitech (PC / TV peripherals) from February 1996 to April 1997. Defendant Hamaide holds an MBA from Columbia Business School, an MS in Information Systems design from the Sorbonne University and a BS in Applied Mathematics from Jussieu University.

20.     Defendant Rodriguez Rodrigquez became the Company's CFO on March 8, 2021 and remains in that position.  Defendant Rodriguez has served as the Company's Senior Vice President of Finance since September 2017. Prior to joining the Company, Defendant Rodriguez served as Chief Accounting Officer and Global Controller for Piksel, Inc. from July 2012 to September 2017 and also held the role of Interim Chief Operating Officer in 2017. From 2000 to 2011, Mr. Rodriguez held several financial leadership roles with the Atari Group, most notably Acting Chief Financial Officer of Atari, Inc. (Nasdaq: ATAR) from 2007 to 2008, and Deputy CFO of Atari SA (Euronext: ATA) from 2008 to 2010. Defendant Rodriguez started his career at Arthur Andersen LLP in 1997 and is a CPA in the State of New York (inactive). Mr. Rodriguez holds a Bachelor of Business Administration – Accounting from Hofstra University.

21.     Collectively, Defendants Sarig, Hamaide and Rodriguez are the "Individual Defendants."

22.     Each of the Individual Defendants:

   a.   directly participated in the management of the Company;

   b.   was directly involved in the day-to-day operations of the Company at the highest levels;

c.  was privy to confidential proprietary information concerning the Company and its business and operations;

d.  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.  approved or ratified these statements in violation of the federal securities laws.

23.     Aterian is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

24.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Aterian under *respondeat superior* and agency principles.

25.     Defendants Aterian and the Individual Defendants are collectively referred to herein as "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **Aterian's Purported Business Model**

26.     Aterian was founded in 2014 as Mohawk Group Holdings, Inc. On April 30, 2021, the Company changed its name to Aterian, Inc. Aterian sells consumer packaged goods ("CPG") under its own brands on various online retail platforms such as Amazon and Walmart. CPG are items used daily by average consumers that require routine replacement or replenishment, such

as food, beverages, clothes, tobacco, makeup, and household products. Aterian's products primarily are small household appliances, kitchenware, and health and beauty products.

27.     Its business consisted of two sections: selling CPGs under its own brands and providing SaaS/PaaS[2] services to third party vendors. According to Aterian's annual report for the fiscal year of 2019 ended on December 31, 2019, selling own branded products, including direct sales and wholesales, constituted 85% of Aterian's net revenue for the year of 2018. SaaS contributed 15% of Aterian's net revenue.

28.     According to Aterian, the Company was founded on the ideology that "if a company selling CPG was founded today, it would apply artificial intelligence ("AI") and machine learning, the synthesis of massive quantities of data and the use of social proof to validate high caliber product offerings as opposed to over-reliance on brand value and other traditional marketing tactics." That is, artificial intelligence that the Company owned would tell the Company what the most popular consumer products at the moment were, and quickly and successfully predict what products would be the next trends. Then the artificial intelligence would place orders for manufacturing such trendy products, market them and price them on e-commerce websites at the most competitive prices with the greatest returns.

29.     According to Defendants, Aterian applies its proprietary technology platform AIMEE (i.e. Artificial Intelligence Mohawk e-Commerce Engine) to identify potentially profitable consumer products, to analyze data from e-commerce platforms and search engines, to manufacture products, primarily in China, and to deliver products under its owned and operated

---

[2] Before 2021, Aterian described its business of offering its AIMEE platform-based services to third party vendors as SaaS services. Starting from 2021, Aterian called the same services as PaaS. For the ease of allegation, Plaintiffs refer to such services as SaaS in this Second Amended Complaint.

brands. As Defendant Sarig claimed, "AIMEE has just massive amount of data and automates various platforms for e-commerce, namely rapidly identifying required market opportunities, managing fulfillment and executing sales and marketing strategy." (Earnings call for the second quarter of 2019). Aterian claims that AIMEE enables it to proceed from identification of product to selling to consumers within six to eight months.

30.    Again, according to Defendants, after Aterian received the goods in the U.S. from overseas manufacturers, it then typically went through three phases:

    a.  <u>Launch phase</u>: Aterian started marketing and launched the product on e-commerce platforms based on the data that AIMEE analyzed regarding the potential popularity and profitability of such product. At this stage, the net margin for a product could be as low as negative 35%.

    b.  <u>Sustain phase</u>: within three months of launch, the product became profitable with an approximately positive 10% net margin.

    c.  <u>Milk or Liquidate</u>: the product entered the milk stage when the product was well received and became a leader in its category in both customer satisfaction and volume sold as compared to its competition on the e-commerce platform. If the product did not enter the sustain phase or achieve profitability at each transaction, or if the customer satisfaction of the product (i.e., ratings) was not satisfactory, then the product would go to the liquidate phase and Aterian would sell the remaining inventory.

**Defendants Tout AIMEE As the Secret of Aterian's Success**

31.    According to Aterian, the Company's proprietary technology platform, AIMEE was "an innovative data analytics platform that provide[d] real-time inventory visibility allowing

Aterian to automate and manage the life-cycle of [Aterian's] consumer product portfolio." Defendants represented that AIMEE, "combine[d] large quantities of data, A.I., machine learning and other automation algorithms, at scale, to allow rapid opportunity identification and automated online sales and marketing of consumer products."

32.    From its founding, Defendants distinguished Aterian from other CPG companies, selling on platforms like Amazon, because it was uniquely technology enabled. Aterian "believe[d] its platform, AIMEE, allows [it] to rapidly and successfully identify new product opportunities and to launch, market and sell products in the rapidly growing global e-commerce market faster than the traditional brick-and-mortar CPG industry." Defendants continued that they "believe[d] this [brought] tremendous competitive advantage in the fast-changing consumer goods landscape." With AIMEE, Defendants expressed, Aterian would "disrupt and scale the business model of consumer packaged goods".

33.    Aterian's IPO Registration Statement listed seven "strengths," that contributed to the Company's success and  differentiated the Company from its competing CPGs companies.  All of them are directly related to AIMEE,  accentuating the significance of technology behind AIMEE to Aterian. Aterian stated that its ability to sell and market its products relied on the performance and continued development of AIMEE.

34.    According to Aterian, AIMEE collected data from various e-commerce platforms, the internet and publicly available data to estimate and determine trends, performance and consumer sentiment on products and searches within e-commerce platforms. Aterian's sales, marketing and fulfillment were substantially integrated into AIMEE, allowing Aterian to automate price, media buying, search engine optimization and shipping. AIMEE was also connected,

through application program interfaces ("APIs")[3], to multiple e-commerce platforms, allowing Aterian to automate the purchase of marketing and automate the change of pricing of product listings on those e-commerce platforms.

35.    In addition to relying on AIMEE to identify business opportunities, and to market and sell Aterian's own branded products, starting from 2018, Aterian began offering third party brands access to AIMEE through its managed software-as-a-service ("SaaS") business through Aterian's pilot programs.

36.    Securities analysts also recognized the significance of AIMEE to Aterian's potential for success:

    a.    On July 11, 2019, National Securities Corporation issued a report "CPG Meet Artificial Intelligence; Initiating With A BUY Rating & $14 Price Target", stating that Aterian was "a new breed of CPG companies as it is melding traditional CPG with artificial intelligence. The company's proprietary software drives product development, marketing, sales, and inventory management".

    b.    On March 23, 2020, D.A. Davidson & Co. issued a report entitled "AIMEE to Aid Third-Party Sellers; BUY", commenting on Aterian's decision to make AIMEE available to other third-party Amazon sellers that used Amazon fulfilment services. D.A. Davidson believed that "letting these sellers utilize AIMEE's logistics software (that leverages AI to choose the best third-party

---

[3] API enables companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies. This allows services and products to communicate with each other and leverage each other's data and functionality through a documented interface. Developers don't need to know how an API is implemented; they simply use the interface to communicate with other products and services. *See* https://www.ibm.com/cloud/learn/api.

fulfillment center)" … "could, ultimately, serve as a catalyst for [Aterian's] SaaS business."

## **Defendants Misrepresent that AIMEE Provided Robust Artificial Intelligence**

37.     Despite Defendants' representations before and throughout the Class Period that AIMEE was an innovative data analytics platform that combines large quantities of data, A.I., machine learning and other automation algorithms, AIMEE is not, nor has it ever been, artificial intelligence. According to Aterian former employees and customers, since the Company's formation and throughout the entire Class Period, AIMEE had never deployed artificial intelligence and machine learning. Rather, AIMEE was and remains an Excel sheet at best. Former employees tell that Aterian employees manually entered and extracted business data in AIMEE at every product phase. Culper Research interviewed former Aterian employees and customers whose statements confirm one another that AIMEE was not artificial intelligence.

38.     According to Culper Research, a former Aterian Technology Executive stated that "when I was there, it was not, even though it was called an AI engine, it was not. That's the truth. Even though we applied natural language processing in some places and sentiment analysis, it just wasn't where the full vision wanted it to be, and so it was a lot of automation and, like you said, rules processing versus actual AI…"

39.     Another former Aterian executive, according to Culper, stated that "When I was there, a lot of it was the story … a lot of the things that were being worked on that were in the AI were things that were more visual progress. Bots that would allow PMs [i.e. product managers] to make queries in natural language about trend forecasts, inventory forecasts. Random things that when you zoom out, you're like, is this the AI?"

40.    A former Aterian Business Development Executive told Culper Research  that "Mohawk [Aterian] has a program called AIMEE which they advertise and which works pretty well, but it's very simple, my understanding of what AIMEE does." He continued that "[t]here's a lot of wild-goose chases with the management. And there's definitely some grey area actions in terms of like how we make things successful, which are totally above board, but they're grey in the sense that how scalable are these things, how much of this is AI, and how much of this is 3 or 4 very smart people with Monster Energy drinks using a computer."

41.    One of Aterian's former customers revealed to Culper Research incredible disappointment with their Aterian experience after having tasked Aterian with evaluating a set of "white space" product ideas:

> And then I guess there's maybe one-third of that the data that they actually had or like how they went about it [evaluating product ideas] was probably much narrower. I come from client services, I understand the sell, sell, sell. And so I think maybe we were oversold on that piece of it, which is why we kind of expected something and got something else … But I think my team, that was kind of our interpretation. I'm like, okay, maybe we were just like a little oversold if you will … Like when you see the deck, they're like, wow, like, this is great. If they can deliver on these capabilities, yes, an awesome company. And so I think where that was at odds for us is just like delivering on those, but I think on the surface yes, for sure.

42.    Other former employees of Aterian confirm what Culper Research reported.

43.    For example, Former Employee 1 ("FE1") served Aterian as a Chief Technology Officer from July 2015 until December 2016.  Based in New York, New York, he directly reported to Defendant Sarig. FE1 stated that AIMEE was Defendant Sarig's "brainchild". "[Defendant Sarig] was very hands on in the business at least when it came to AIMEE.  "[Defendant Sarig's] vision was very different than what it was in actuality."

44.    Rather than AIMEE's combining large quantities of data, artificial intelligence, machine learning and other automation algorithms, at scale, to allow rapid opportunity

identification and automated online sales and marketing of consumer products—as Defendants publicly claimed—FE1 states, it was just Defendant Sarig's vision. FE1 states that he was brought on-board to work on Defendant Sarig's vision, but AIMEE accomplished only ""rudimentary things." "It wasn't that sophisticated," FE1 concludes. FE1 further stated that during his tenure, AIMEE did not automate the purchase of marketing and various parts of the fulfillment and logistics operations or automate changes on product listings. Regarding AIMEE interfaced with e-commerce platforms via APIs, FE1 stated that "Amazon does have APIs but the information that we wanted wasn't exposed through APIs so we would basically mimic somebody visiting a website, launched site and take the data from the site as if a person was looking at it rather than a bot." There were a bunch of bots that mimicked people and scraped data that way. "It was branded and promoted as this Artificially Intelligent E-Commerce system. When I was there, it was crap. It was basically like scraping data from Amazon." FE1 continues, "[i]t did not have Artificial Intelligence".

45.    Former Employee 2 ("FE 2") was Aterian's Head of Global Operations from June 2015 to October 2015 and as a Brand Manager from November 2015 to April 2017. In the capacity of the Brand Manager, he handled the following brands for Aterian: Vremi, Xtava, Rif6. His job was to grow the brands. He also built up the Chinese operation. Throughout his tenure, he was based in New York, New York and was one of the few people in the Company that reported directly to Sarig. When Aterian hired FE2, it was "already pitching this whole concept of AIMEE." FE2 continues that "[t]here was this one guy Guspare (Bonventre) who is supposed to be a quantum math guy, he was not. He was the one that was in charge of building everything behind AIMEE. It turned out, AIMEE was nothing more than an advanced Excel sheet, not even advanced." FE2 describes AIMEE as "a fancy version of a spreadsheet." FE2 relates that in his position, he input

certain data, including how much inventory Aterian had as to a specific product and how many units Aterian was selling at the moment, and then all AIMEE calculated was when he would run out of inventory. Excel performs the identical function. During FE2's tenure, AIMEE had not additional capabilities beyond Excel.

46.    FE 2 notes that Defendant Sarig led weekly meetings regarding AIMEE. The vision was for AIMEE to scour Amazon's postings, analyze bad reviews, and identify opportunities for better products. But during his tenure, such vision never transpired. Rather, FE2 manually conducted marketing research.

47.    FE2 also confirms that during his tenure, as Defendants touted AIMEE publicly as combining large quantities of data, artificial intelligence, machine learning and other automation algorithms, at scale, to allow rapid opportunity identification and automated online sales and marketing of consumer products, "AIMEE was non-existent. It was not a real tool." He then used a then new Aterian brand "RSVP" that the Company wanted to grow at the time as an example. "AIMEE was not part of this [marketing] at all. The only thing that AIMEE did was sales and maybe some like operational stuff, like figuring out how much you can fit into a container for a shipment." In fact, employees had to use "levers and marketing things to grow their business".

48.    During his tenure, FE2 acknowledges that the Company had plans to alter or enhance the SaaS/PaaS before or at the time of his departure, stating "there were always plans to upgrade it but during the time I was there it was all showmanship and talk, nothing actually came to life." Since his departure, others have told FE2 that Aterian has not added anything to improve AIMEE.

49.    FE2 also stated that when Jeneq Management, a firm that conducted IPO due diligence for Aterian, contacted FE2 before Aterian's IPO, asking a series of questions on

Aterian's operations, its system, partnerships, and thoughts on leadership. When inquired about his experience with AIMEE, FE2 told Jeneq that he did not see any artificial intelligence in AIMEE.

50.     Former Employee 3 ("FE 3"), based in New York, New York, worked as Aterian's Senior Account Executive/Account Executive from January 2019 until September 2019. He reported to Aterian's Vice President of Sales during his tenure. FE3's department consisted of him and his boss. FE3 confirms that the issues FE1 and FE2 found with AIMEE persisted. About Aterian's SaaS business, FE3 stated that when Aterian hired him, management misrepresented directly to him that AIMEE was artificial intelligence and was a fully developed SaaS product. During his tenure, however, he found that "it is not anyway ready for that. It is completely manual. I couldn't even run reports myself." There is no user interface. "It was nothing that was developed." Even as Aterian was a rudimentary Excel spreadsheet, however, Defendants publicly disclosed and attempted to sell AIMEE as an SaaS platform respectively to investors and third party brand owners.

51.     FE3 states that "there is no such thing as artificial intelligence in the SaaS. They call things AI, it's like a buzz word. There is definitely a lot of human input." In fact, the team responsible for overseeing AIMEE "kept trends. They watched for it when it was supposed to be a machine learning thing, but nothing was automated." FE3 continues that although AIMEE was connected through APIs to multiple e-commerce platforms, Aterian input information manually, including when adding new products to the system or changing prices.

52.     FE3 notes that with respect to AIMEE, Aterian overpromised and failed to deliver. Aterian customers "regularly" complained directly to FE3 about AIMEE. Customers complained that they were supposed to have this happen and it never transpired.  They were supposed to double down here and it did not do so.  There had to actually be a human who was doing that. "The system

did not do it on its own." FE3 confirms that AIMEE was a flawed product that lacked customer interest.

53.    FE3 states that Aterian management "knew the product wasn't there. Myself and my boss told Yaniv Sarig and Fabrice Hamaide that it was not there and they were still trying to sell it. They became extremely frustrated and said that we can sell it. It will eventually develop." FE3 noted that he and his boss met with Sarig and Hamaide whenever necessary.

54.    FE3 states that Aterian issued stock through its IPO because the Company could not convince investors to purchase shares through private placements. Before the IPO, Aterian created an SaaS department when the platform was not ready because the management knew having a SaaS product – one of the hottest technology trend at the time – would greatly increase the Company's valuation. "Because there is a higher multiplier on SaaS than there is on just direct sales. They wanted that multiplier to be able to go public. It wasn't real. They knew the product didn't work. It was a multiplier unable to go public". FE3 stated that as soon as Aterian got the approval letter to go public in 2019, the Company shut the SaaS platform down, right before FE3 left the Company.

### During The Class Period, Aterian Used Acquisitions To Cover Up AIMEE's Failure to Sustain and Expand Organic Growth

55.    Both before and during the Class Period, AIMEE did not possess the artificial intelligence and machine learning capability that Defendants publicly claimed. As a result, Aterian was not able rapidly and successfully to identify new product opportunities and launch, autonomously market, and sell products as Defendants had claimed. As of March 16, 2021, none of Aterian's products had achieved the Milk Phase, as Defendants described it.

56.    Additionally, Aterian's SaaS pilot programs starting in 2018 still remained as pilot programs as of March 16, 2021, showing the stagnancy of Aterian's SaaS services.

57. During the same time, Aterian's stock traded below its $10 IPO price and continued declining. By the end of the first quarter of 2020, Aterian's stock price declined to the historical lowest price range and was trading between $1-$2 per share due to the Company's sluggish business performance.

58. To keep investors interested in its stock, on March 5, 2020, despite the worst quarterly net revenue since its IPO, Aterian announced that as to the 2020 outlook, the Company expected its net revenue to be in the range of $160.0 million to $170.0 million, which would be approximately $50 million higher than 2019 net revenue. Such increase would be "driven primarily by continued growth of its existing product portfolio and the positive contribution from new products launched in 2020".

59. Unable to grow Aterian's business organically due to the lack of the purported artificial intelligence, Defendants turned to acquiring companies so it could immediately inflate Aterian's revenue and cover up AIMEE's failure to that point.

60. On August 24, 2020, immediately before the market opened, Aterian announced it had entered into a definitive agreement to purchase the assets of Truweo, a leading ecommerce brand in the health and personal wellness category. Aterian also simultaneously raised its 2020 outlook on net revenue to be in the range of $175.0 million to $185.0 million, up from $170.0 million to $180.0 million, reflecting the addition of Truweo. Upon this news, Aterian's stock price rose by 9.7% from the same day's open price, with unusually high daily trading volume.

61. On December 01, 2020, after the market closed, Aterian announced that it acquired the assets of leading e-commerce business brands Mueller, Pursteam, Pohl and Schmitt, and Spiralizer ("Acquired Brands") from 9830 Macarthur LLC, ZN Direct LLC, and Reliance Equities Group, LLC. Aterian also simultaneously raised its 2020 outlook on net revenue to be in the range

of $180.0 million to $190.0 million, up from $175.0 million to $185.0 million, reflecting the addition of the Acquired Brands. Upon this news, Aterian's stock price rose by 17.9% from the previous close price of $6.89 per share to close at $8.12 per share, with unusually high daily trading volume. In the next two days, Aterian's stock price continue rising by another 9.4% and 9.12%, with unusually high daily trading volume.

62.    On February 2, 2021, before the market open, Aterian announced that it acquired the assets of e-commerce company Healing Solutions, LLC ("Healing Solutions"), a leading online seller of essential oils. Aterian also simultaneously raised its 2020 outlook on net revenue to be in the range of $340 million to $370 million, up from $290 million to $320 million, reflecting the addition of the Healing Solutions business. Upon this news, Aterian's stock price rose by 25.8% from the previous close price of $22.6 per share to close at $28.43 per share, with unusually high daily trading volume. In the next two days, Aterian's stock price continue rising by another 12.6% and 4.4%, with unusually high daily trading volume.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

63.    On August 24, 2020, Aterian filed with the SEC a Form 424B5 Prospectus ("August 2020 Prospectus"). The August 2020 Prospectus states in the relevant parts that

> **We believe we are reinventing how to rapidly and successfully identify new product and market opportunities, and to launch, autonomously market and sell products in the rapidly growing global e-commerce market by leveraging our proprietary software technology platform, known as AIMEE. AIMEE combines large quantities of data, A.I., machine learning and other automation algorithms, at scale, to allow rapid opportunity identification and automated online sales and marketing of consumer products**.
>
> AIMEE sources data from various e-commerce platforms, the internet and publicly available data, allowing us to estimate and determine trends, performance and consumer sentiment on products and searches within e-commerce platforms. This functionality

allows us to help determine which products to market, manufacture through contract manufacturers, import and sell on e-commerce marketplaces. AIMEE is also connected, through APIs, to multiple e-commerce platforms. **This allows us to automate the purchase of marketing, automate various parts of our fulfillment and logistics operations and to automate the pricing changes on product listings.**

(Emphasis added)

64.     These statements were materially false and misleading because Defendants failed to disclose that (i) AIMEE was not artificial intelligence; (ii) AIMEE was unable to identify new product and market opportunities, but rather it required human beings to manually analyze data that were stored in AIMEE to identify new product opportunities; (iii) AIMEE was unable to launch or autonomously market products, but rather it required human beings to initiate the launch and manually market the products; (iv) AIMEE did not automate the purchase of marketing, or various parts of Aterian's fulfillment and logistics operations, but rather Aterian input information manually, including when adding new products to the system or changing prices.

65.     On August 25, 2020, Aterian filed a Form 424B5 Prospectus ("August 2020 Prospectus"). The August 2020 Prospectus states in the relevant parts that

> **We believe we are reinventing how to rapidly and successfully identify new product and market opportunities, and to launch, autonomously market and sell products in the rapidly growing global e-commerce market by leveraging our proprietary software technology platform, known as AIMEE. AIMEE combines large quantities of data, A.I., machine learning and other automation algorithms, at scale, to allow rapid opportunity identification and automated online sales and marketing of consumer products**.
>
> AIMEE sources data from various e-commerce platforms, the internet and publicly available data, allowing us to estimate and determine trends, performance and consumer sentiment on products and searches within e-commerce platforms. This functionality allows us to help determine which products to market, manufacture

through contract manufacturers, import and sell on e-commerce marketplaces. AIMEE is also connected, through APIs, to multiple e-commerce platforms. **This allows us to automate the purchase of marketing, automate various parts of our fulfillment and logistics operations and to automate the pricing changes on product listings.**

(Emphasis added)

66.     These statements were materially false and misleading because Defendants failed to disclose that (i) AIMEE was not artificial intelligence; (ii) AIMEE was unable to identify new product and market opportunities, but rather it required human beings to manually analyze data that were stored in AIMEE to identify new product opportunities; (iii) AIMEE was unable to launch or autonomously market products, but rather it required human beings to initiate the launch and manually market the products; (iv) AIMEE did not automate the purchase of marketing, or various parts of Aterian's fulfillment and logistics operations, but rather Aterian input information manually, including when adding new products to the system or changing prices.

67.     On November 9, 2020, Aterian filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarterly period ended September 30, 2020 (the "3Q2020 10-Q").  Defendants Sarig and Hamaide signed the 3Q2020 10-Q. Defendants Sarig and Hamaide also certified the 3Q2020 10-Q's accuracy pursuant to RULE 13a-14(a) under the Securities Exchange Act as adopted pursuant to section 302 of the Sarbanes-Oxley act of 2002 ("SOX") and pursuant to Sox Section 906.

68.     3Q2020 10-Q, in relevant part, states that

**We believe we are reinventing how to rapidly and successfully identify new product and market opportunities, and to launch, autonomously market and sell products in the rapidly growing global e-commerce market by leveraging our proprietary software technology platform, known as AIMEE. AIMEE**

> **combines large quantities of data, A.I., machine learning and
> other automation algorithms, at scale, to allow rapid
> opportunity identification and automated online sales and
> marketing of consumer products.**
>
> AIMEE sources data from various e-commerce platforms, the
> internet and publicly available data, allowing us to estimate and
> determine trends, performance and consumer sentiment on products
> and searches within e-commerce platforms. This functionality
> allows us to help determine which products to market, manufacture
> through contract manufacturers, import and sell on e-commerce
> marketplaces. AIMEE is also connected, through APIs, to multiple
> e-commerce platforms. **This allows us to automate the purchase
> of marketing, automate various parts of our fulfillment and
> logistics operations and to automate the pricing changes on
> product listings.**
>
> (Emphasis added)

69.     These statements were materially false and misleading because Defendants failed

to disclose that (i) AIMEE was not artificial intelligence; (ii) AIMEE was unable to identify new

product and market opportunities, but rather it required human beings to manually analyze data

that were stored in AIMEE to identify new product opportunities; (iii) AIMEE was unable to

launch or autonomously market products, but rather it required human beings to initiate the launch

and manually market the products; (iv) AIMEE did not automate the purchase of marketing, or

various parts of Aterian's fulfillment and logistics operations, but rather Aterian input information

manually, including when adding new products to the system or changing prices.

70.     The 3Q2020 10-Q also states that "[w]e have launched numerous products over the

last several quarters and **have experienced a lower than expected success rate of products**

reaching the sustain phase. In addition, in certain instances, even when a product has reached the

sustain phase, our forecasts, at times, have resulted in inventory overages." (Emphasis added).

These statements were materially false and misleading because Defendants failed to disclose that

AIMEE did not have the artificial intelligence to successfully identify product opportunities.

Therefore, rather than experiencing lower-than-*expected* success rate, Aterian in fact experienced lower than *advertised* success rate.

71.     3Q2020 10-Q also states that

> On September 10, 2019, we completed the acquisition of the assets of a personal wellness company (the "Aussie Health Assets"), and **on August 26, 2020, we completed the acquisition of assets of a consumer product business (the "Truweo Assets"). We may in the future seek to acquire or invest in other businesses, features or technologies that we believe could complement or expand our market, enhance our technical capabilities or otherwise offer growth opportunities.** The pursuit of potential acquisitions may divert the attention of management and cause us to incur various expenses in identifying, investigating and pursuing suitable acquisitions, whether or not they are consummated.

> (Emphasis added)

72.     These statements were materially false and misleading because Defendants failed to disclose that the Company acquired Truweo Assets and might seek to acquire or invest in other businesses, features or technologies because Defendants wanted to mask the fact that AIME lacked the artificial intelligence represented by Defendants to rapidly and successfully identify product opportunities and automate the product cycles. Defendants acquired other CPGs companies to make up and increase the revenues that Defendants represented that AIMEE could achieve.

73.     On March 16, 2021, Aterian filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2020 (the "2020 10-K"). Defendants Sarig signed the 2020 10-K. Defendants Sarig and Rodriguez certified the 3Q2020 10-Q's accuracy pursuant to RULE 13a-14(a) under the Securities Exchange act as adopted pursuant to Sox Section 302 and pursuant to Sox Section 906.

74.     The 2020 10-K also states in the "Risk Factors" that

> *We rely on AIMEE and other information technologies and systems to operate our business and to maintain our*

*competitiveness, and any failure to invest in and adapt to technological developments and industry trends could harm our business.*

We depend on the use of our proprietary technology platform named AIMEE and other sophisticated information technologies and systems, including technology and systems used for websites and apps, customer service, logistics and fulfillment, supplier connectivity, communications and administration. **Artificial intelligence and machine learning technologies are subject to rapid changes and our technology is yet to be fully automated.** As our operations grow in size, scope and complexity, including through acquisitions, we will need to continuously improve and upgrade our systems and infrastructure to offer an increasing number of consumer-enhanced services, features and functionalities, while maintaining and improving the reliability and integrity of our systems and infrastructure.

**Our future success also depends on our ability to adapt AIMEE, our services and infrastructure, including our research, sales and marketing, and logistics and fulfillment platform which leverages AIMEE, to meet rapidly evolving e-commerce trends and demands while continuing to improve our software's performance, features and reliability.** The emergence of alternative platforms may require us to continue to invest in new and costly technology. **We may not be successful, or we may be less successful than our competitors, in developing technologies that operate effectively across multiple e-commerce platforms, which would negatively impact our business and financial performance.** New developments in other areas, such as cloud computing providers and other technological changes, could also make it easier for competitors to enter our markets due to lower up-front technology costs. In addition, we may not be able to maintain our existing systems or replace our current systems or introduce new technologies and systems as quickly or cost effectively as we would like. We expect to incur significant costs in the development of AIMEE's functionality, and **any failure to invest in and adapt to technological developments and industry trends may have a material adverse effect on our business, results of operations, financial condition and prospects**.

(Emphasis in heading original and otherwise added).

75.    These statements were materially false and misleading because Defendants failed

to disclose that (i) the risk of failure to develop the technology of artificial intelligence and machine

learning that could operate effectively across multiple e-commerce platforms had been materialized at the time of the 2020 10-K; (ii) such failure had already negatively impact Aterian's business and financial performance at the time of the 2020 10-K.

76.    The 2020 10-K states in relevant part that

**We believe we are reinventing how to rapidly and successfully identify new product and market opportunities, and to launch, autonomously market and sell products in the rapidly growing global e-commerce market by leveraging our proprietary software technology platform, known as AIMEE. AIMEE combines large quantities of data, AI, machine learning and other automation algorithms, at scale, to allow rapid opportunity identification and automated online sales and marketing of consumer products.**

AIMEE sources data from various e-commerce platforms, the internet and publicly available data, allowing us to estimate and determine trends, performance and consumer sentiment on products and searches within e-commerce platforms. This functionality allows us to help determine which products to market, manufacture through contract manufacturers, import and sell on e-commerce marketplaces. AIMEE is also connected, through application program interfaces ("APIs"), to multiple e-commerce platforms. **This allows us to automate the purchase of marketing, automate various parts of our fulfillment and logistics operations and to automate pricing changes on product listings.**

(Emphasis added)

77.    These statements were materially false and misleading because Defendants failed to disclose that (i) AIMEE was not artificial intelligence; (ii) AIMEE was unable to identify new product and market opportunities, but rather it required human beings to manually analyze data that were stored in AIMEE to identify new product opportunities; (iii) AIMEE was unable to launch or autonomously market products, but rather it required human beings to initiate the launch and manually market the products; (iv) AIMEE did not automate the purchase of marketing, or

various parts of Aterian's fulfillment and logistics operations, but rather Aterian input information manually, including when adding new products to the system or changing prices.

78.    The 2020 10-K also states that

> Market Research. **AIMEE's idea generator functionality quickly analyzes and filters millions of shopping-related data points to identify product opportunities, including relevant product specifications,** based on consumer sentiment, product trends and attributes and competitive landscape analysis, among other things.

> (Emphasis added)

79.    These statements were materially false and misleading because Defendants failed to disclose that (i) AIMEE was not artificial intelligence; (ii) AIMEE did not have the ability to analyze data or to identify new product opportunities, but rather it required human beings to manually analyze data that were stored in AIMEE to identify new product opportunities; (iii) AIMEE did not have the ability to market products, but rather it required human beings to initiate the launch and manually market the products.

80.    The 2020 10-K also states that "[w]e have also leveraged AIMEE to buy (acquire through acquisition) consumer product brands and related products. During 2020, we acquired the brands Truweo, Mueller, Pursteam, Pohl and Schmitt, and Spriralizer and their related products and during 2019, we acquired the brand Aussie Health."

81.    These statements were materially false and misleading because Defendants failed to disclose that the Company did not acquire the brands Truweo, Mueller, Pursteam, Pohl and Schmitt, and Spriralizer and their related products in 2020 by leveraging AIMEE's artificial intelligence. The truth was directly to the contrary: Defendants made such acquisitions to mask the fact that AIME lacked the artificial intelligence represented by Defendants to rapidly and successfully identify product opportunities and automate the product cycles. Defendants acquired

other CPGs companies to make up and increase the revenues that Defendants represented that AIMEE could achieve.

82.    Regarding the Company's PaaS/SaaS services, the 2020 10-K states that

> **We believe AIMEE is uniquely equipped to add value to brands and manufacturers in this emerging paradigm, leveraging real-time analytics and sales automation to help brands more effectively manage their marketplace strategy.**
>
> **We believe that our PaaS solution, which includes combined access to our team's expertise and the AIMEE platform, could provide a significant advantage over other competitors in this industry.** We believe this is because many incumbent CPG companies have historically operated as business-to-businesses and have not invested sufficiently to succeed on online marketplaces. With a PaaS solution, we believe we can bridge this operational gap by offering our technology combined with our substantial know-how in managing business-to-consumer supply chains, marketing, and customer service, among other things.
>
> **We continue to offer our Platform as a Service solution through pilot programs to brands and manufacturers.** Our offering provides substantially the same capabilities utilized for our owned and operated portfolio of products."\
>
> (Emphasis added)

83.    These statements were materially false and misleading because Defendants knew that (i) its SaaS/PaaS did not knot have artificial intelligence but they still tried to sell it to third party customers; (ii) its SaaS/PaaS flawed product frequently received customers' complaints and offered no competitive advantage for its users. These statements were materially false and misleading also because Defendants had stopped developing SaaS/PaaS after the IPO.

## **INSIDER SALES**

84.    During the Class Period when Aterian insiders, including Defendant Sarig, knew or recklessly disregarded the material, adverse information they withheld from the market, they claim to have established Rule 10b5-1 trading plans on December 14 and 15, 2020. Through these plans, they sold material amounts of their Aterian holdings suspicious in timing and amount when

Aterian's stock price was at the historically highest range of $30-47 per share. These insiders profited by over $36.3 million as shown in the summary table below. A detailed sales table is attached hereto as Exhibit 2 and incorporated herein by reference.

| Name | Position | Shares Sold during the Class Period | Dollar Amount Pocketed | Total Number of Sales During the Class Period | Total Number of Sales Reported After the Class Period |
|---|---|---|---|---|---|
| Yaniv Sarig | CEO, President& Director | 322,267 | $10,405,802.65 | 12 | 11 |
| Joseph Risico | General Counsel | 231,362 | $7,464,877.51 | 15 | 12 |
| Tomer Pascal | Chief Revenue Officer | 217,468 | $7,289,371.27 | 13 | 12 |
| Mihal Chaouat-Fix | Chief Product Officer | 165,490 | $5,635,877.27 | 13 | 11 |
| Zion Roi Zahut | Chief Technology Officer | 161,702 | $5,481,399.59 | 13 | 10 |

85.    These insiders also provided misleading information to investors on their insider sales. During the Class Period, Defendants disclosed on Forms 4 they filed with the SEC only 10 out of 66 trades they actually executed, constituting only 27.2% of their entire profits. SEC rules required Defendants to disclose all trades within two days of execution.[4] The insider Defendants, however, withheld the information relating to 56 trades, representing 72.8% of their entire profits. They only belatedly disclosed these transactions four months later, in July 2021, amending their

---

[4] According to Sections 16(a) and 23(a) of the Securities Exchange Act, an insider must file a Form 4 "Statement of Changes in Beneficial Ownership" whenever there is a material change in the holdings of company insiders. Insiders consist of directors and officers of the company, as well as any shareholders, owning 10% or more of the company's outstanding stock. It must be filed within two business days starting from the end of the day the material transaction occurred.

original Form 4s and finally disclosing for the first time the 56 trades—after the Class Period. Until that point, Investors had never been informed of the complete picture and massive magnitude of such insider trades. The original Forms 4 that the insiders filed during the Class Period and the subsequent amendments to those Forms 4 that the insiders filed after the Class Period are attached hereto as Exhibit 3.

86.    For example, on March 15, 2021, Defendants Sarig filed with the SEC a Form 4, reporting a March 11, 2021 exercise of 282,051 options for an exercise price of $9.72/share. The same Form 4 reports a March 11, 2021 sale of 20,108 shares for $34.35/share. Also on that same Form 4, Defendants Sarig reported, after his March 11, 2021 transactions, he beneficially owned 521,769 "securities." On July 2, 2021, Defendant Sarig filed with the SEC an amended Form 4/A, detailing twelve transactions on March 10 and March 11, 2021. In total, on those two days in March, unbeknownst to the market, Defendant Sarig sold 322,267 Aterian shares with the profit of $10,405,802.65, ending the day with 239,718 "securities", 54% less than he originally disclosed. Coupled with the materially false March 15, 2021 Form 4 Defendants Sarig's actual trades on March 10 and March 11, 2021 were suspicious in both timing and amount.

87.    Similarly, on March 15, 2021, Aterian's Chief Product Officer Mihal Chaouat-Fix ("Chaouat-Fix") filed with the SEC a Form 4, reporting two March 11, 2021 sale of 60,288 shares for $34.35/share and 4,127 shares for $31.65/share, respectively. The same Form 4 reports exercise of 862 options for an exercise price of $9.72/share and 31,310 options for an exercise price of $4.8/share on March 12, 2021, respectively. Also on that same Form 4, Chaouat-Fix reported, after his March 12, 2021 transactions, he beneficially owned 291,197 "securities." On July 2, 2021, Chaouat-Fix filed with the SEC two amended Forms 4/A, detailing additional fourteen transactions from March 10 to March 15, 2021. In total, on those six days in March, unbeknownst to the market,

Chaouat-Fix sold 165,490 Aterian shares with the profit of $5,635,877.27, ending the day with 259,025 "securities", 11% less than he originally disclosed. Coupled with the materially false March 15, 2021 Form 4 Chaouat-Fix's actual trades on March 11, 2021 were suspicious in both timing and amount.

88.    On March 15, 2021, Aterian's Chief Revenue Officer Tomer Pascal ("Pascal") filed with the SEC a Form 4, reporting a March 11, 2021 exercise of 20,000 options for an exercise price of $9.72/share and another 20,000 options for an exercise price of $9.72/share, respectively. The same Form 4 reports a March 11, 2021 sale of 68,734 shares for $34.35/share. Also on that same Form 4, Pascal reported, after his March 11, 2021 transactions, he beneficially owned 270,358 "securities." On March 17, 2021, Pascal filed with the SEC a Form 4, reporting exercise of 20,000 options for an exercise price of $9.72/share on March 15, 2021 and another 20,000 options for an exercise price of $9.72/share on March 16, 2021, respectively. On that same Form 4, Pascal reported, after his March 16, 2021 transactions, he beneficially owned 310,358 "securities." On July 2, 2021, Pascal filed with the SEC two amended Forms 4, detailing sixteen transactions on March 10, 11, 12, 15, and 16, 2021. In total, during the Class Period, namely on those five days in March, unbeknownst to the market, Pascal sold 217,468 Aterian shares with the profit of $7,289,371.27, ending the day with 230,358 "securities", 26% less than he originally disclosed during the Class Period. Coupled with the materially false March 15 and 17, 2021 Forms 4 Pascal's actual trades on March 10, 11, 12, 15, and 16, 2021 were suspicious in both timing and amount.

89.    On March 15, 2021, Aterian's General Counsel Joseph Risico ("Risico") filed with the SEC a Form 4, reporting a March 11, 2021 sale of 37,587 shares for $34.35/share and a March 11, 2021 sale of 2,954 shares for $31.65/share. On March 17, 2021, Risico filed with the SEC a

Form 4, reporting exercise of 111,524 options for an exercise price of $9.72/share on March 15, 2021, and a sale of 38,756 shares for $29.83/share on March 16, 2021, respectively. On that same Form 4, Risico reported, after his March 16, 2021, transactions, he beneficially owned 251,653 "securities." On July 2, 2021, Risico filed with the SEC two amended Forms 4/A, detailing fourteen transactions on March 10, 11, 15, and 16, 2021. In total, during the Class Period, namely on those four days in March, unbeknownst to the market, Risico sold 231,362 Aterian shares with the profit of $7,464,877.51, ending the day with 140,129 "securities", 44% less than he originally disclosed during the Class Period. Coupled with the materially false March 15 and 17, 2021 Forms 4 Risico's actual trades on March 10, 11, 15, and 16, 2021 were suspicious in both timing and amount.

90.    On March 15, 2021, Aterian's Chief Technology Officer Zion Roi Zahut ("Zahut") filed with the SEC a Form 4, reporting a March 11 2021 sale of 33,330 shares for $34.34/share and a March 12, 2021 sale of 19,269 shares for $34.35/share. The same Form 4 reports a March 12, 2021 exercise of 48,065 options for an exercise price of $10/share. On March 17, 2021, Zahut filed with the SEC a Form 4, reporting a sale of 8,439 shares for $31.79/share on March 16, 2021. On that same Form 4, Zahut reported, after his March 16, 2021 transaction, he beneficially owned 188,736 "securities." On July 2, 2021, Zahut filed with the SEC two amended Forms 4/A, detailing twelve transactions on March 10, 11, 12, and 16, 2021. In total, during the Class Period, namely on those four days in March, unbeknownst to the market, Zahut sold 161,702 Aterian shares with the profit of $5,481,399.59, ending the day with 140,671 "securities", 25% less than he originally disclosed during the Class Period. Coupled with the materially false March 15 and 17, 2021 Forms 4 Zahut's actual trades on March 10, 11, 12, and 16, 2021 were suspicious in both timing and amount.

## TRUTH EMERGED ON THE MARKET

91.     Having conducted extensive research and interviews of former Aterian employees and customers, on May 4, 2021, securities analyst firm Culper Research published a report on Aterian, entitled: "Aterian (ATER): Bought from Felons & Fraudsters, Sold to You" (the "Culper Report").

92.     As stated above, the Culper Report exposed the fact that AIMEE was not artificial intelligence and Aterian was not a technology-driven company. Aterian used acquisitions to obscure the fact that the Company's core business was failing to produce.  A complete copy of the Culper Report is attached hereto as <u>Exhibit 4</u> and incorporated herein by reference.

93.     Regarding AIMEE, the Culper Report stated:

> **Aterian Isn't an Artificial Intelligence Company; It's a Reseller of Cheap Chinese Goods**
>
> Aterian claims that AIMEE, its software, is the Company's special algorithmic sauce for rolling out new consumer products. We think AIMEE is mostly a stock promotion tool with limited capabilities. Numerous former employees corroborate our view.
>
> (Emphasis original)

94.     The Culper Report continued:

> It Appears No One Wants AIMEE; Does No One Like Making Money?
>
> We think that if AIMEE were truly capable of meeting the Company's wild claims, then third-party sellers ought to look upon AIMEE as a miraculous cash machine. Aterian has long touted the potential for selling this to third parties, yet it seems that potential customers simply don't care to use it.
> …
> Aterian continues to tout its potential "PaaS" opportunity, yet we think that after three years of abject failure, the Company has better odds of finding Bigfoot than it does creating a meaningful "PaaS" business.

Aterian's hype-laden claims about its AI capabilities stand in contrast not only to the Company's own lackluster performance, but to the robust data offered by companies such as JungleScout and Helium 10. JungleScout was founded in 2015 and can "Quickly validate or eliminate any product idea by using our proprietary opportunity score", backing this up with case studies that demonstrate accuracy against leading peers. **AIMEE is not even mentioned in a list of 9 competitors**.

(Emphasis original)

95.    On this news, the price of Aterian stock fell from its May 3, 2021 close price of $20.66 to a May 5, 2021 close of $15.72 per share, a two-day drop of $4.94 per share or approximately 24% with unusually high daily trading volumes.

## ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

96.    As exposed by the Culper Report, Aterian offered free or heavily discounted products in exchange for positive reviews. Former employees revealed that Aterian did more than that to manipulate its products' popularity.

97.    FE1 noted that Aterian fabricated fake reviews or offered free products for positive reviews. "There were thousands and thousands of 5-star reviews from their products, some of which were total crap." After working there, FE1 realized that Aterian's product reviews could not be trusted.

98.    According to FE2, when Aterian launched a new product, they would inflate it with fake reviews. When Amazon changed its business model to disallow the practice of giving free or discounted products in exchange for reviews, Aterian started to give rebates to customers and ultimately used a method provided by FE2 to give out gift cards to people. That way, Aterian automatically added money to these people's gift cards which function as their credit cards. When these customers applied for a product, the money was added to their accounts. Then these

customers would buy the product and verify the purchase. "There you go. You have a verified review," said FE2.

99.    FE 2 noted that the practice of falsifying reviews "was very much ongoing forever". Almost every Aterian product had inflated reviews. FE2 stated that Aterian secretly paid a "shady character" called Akemi Sue Fisher who was believed to live in the Midwest, possibly Illinois or Michigan, to inflate product reviews. "Every time products would get below a certain let's say rating or whatever, it would always be contact Akemi." Defendant Sarig told FE2 to message Akemi. FE2 only communicated with her via email – akemisue@gmail.com. Akemi replied "Okay". FE 2 stated that Aterian paid for reviews weekly. Additionally, Aterian always paid for reviews when a product pre-launch and post-launch. FE2 confirmed that Defendant Sarig knew all these practices. FE2 stated that prior to instituting the credit card system in early 2016, Aterian gave money back to customers through Venmo or PayPal. FE2 noted that Defendant Sarig came up with these ideas.

100.    FE3 also confirmed that Aterian used rebate programs and paid for artificial reviews to pump up their product offerings. FE3 stated that a lot of what they did were in bots. "they [Aterian] would do it through Israel." Aterian inflated reviews "with these bots through Facebook."

101.    On May 5, 2021, Aterian published a press release denying the allegations in the Culper Report. In the press release, Aterian claimed that "Aterian has developed a leading technology-enabled software platform, AIMEE, that together with the Company's dedicated and talented team, continues to drive strong financial and operational performance for our business." Notably, although Aterian still claimed AIMEE as a leading technology-enabled software platform, Aterian did not challenge the Culper Report's allegation that AIMEE was not artificial intelligence

and Aterian was not an AI company. Aterian also did not deny the Culper Report's allegation that

Aterian's SaaS/PaaS services had failed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:

### Fraud-on-the-Market Doctrine

102.    Plaintiffs are entitled to rely, and will rely, upon the presumption of reliance

established by the fraud-on-the-market doctrine in that:

a.  Defendants made public misrepresentations or failed to disclose material facts

during the Class Period;

b.  the omissions and misrepresentations were material;

c.  Aterian common stock is traded in an efficient market;

d.  the misrepresentations and omissions alleged would tend to induce a reasonable

investor to misjudge the value of Aterian common stock; and

e.  Plaintiffs and members of the Class purchased and/or sold Aterian common stock

between the time the Defendants failed to disclose or misrepresented material facts

and the time the true facts were disclosed, without knowledge of the omitted or

misrepresented facts.

103.    At all relevant times, the market for Aterian common stock was an efficient

market for the following reasons, among others:

(i)     the securities were traded on Nasdaq;

(ii)    on average shares representing more than 2.0% of the securities' float were traded

weekly during the Class Period;

(iii)    During the Class Period, Aterian was followed by numerous securities analysts employed by major brokerage firms, including Oppenheimer and National Securities, who wrote reports that were widely distributed and publicly available;

(iv)    Aterian met the criteria for eligibility to file an S-3 Registration Statement during the Class Period;

(v)    Aterian timely filed all required annual, quarterly and material event reports with the SEC during the Class Period;

(vi)    Aterian regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(vii)    the price of Aterian securities responded quickly to incorporate and reflect new public information concerning Aterian during the Class Period;

(viii)    more than ten market makers made a market in Aterian common stock during the Class Period.

104.    As a result of the foregoing, the market for Aterian promptly digested current information regarding Aterian from all publicly available sources and reflected such information in Aterian's common stock price. Under these circumstances, all purchasers of Aterian common stock during the Class Period suffered similar injury through their purchase of Aterian common stock at artificially inflated prices, and a presumption of reliance applies.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

105.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased Aterian common stock during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

106.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Aterian common stock was actively traded on the Nasdaq.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class. Members of the Class may be identified from records maintained by Aterian or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

107.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

108.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

109.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Aterian;

(c) whether the Individual Defendants caused Aterian to issue false and misleading statements during the Class Period;

(d)  to what extent the members of the Class have sustained damages and the proper measure of damages.

110.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

111.    The false and misleading statements alleged herein were not forward-looking. To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the

purportedly forward-looking statements. Such cautions were absent from Aterian's Class Period filings and oral disclaimers.

112.    Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Aterian who knew that those statements were false or misleading when made. Moreover, to the extent that Defendants issued any disclosures designed to warn or caution Plaintiffs of certain risks, those disclosures were also false and misleading.

## <u>COUNT I</u>

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder<br><u>Against All Defendants</u>

113.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

114.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

115.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

116.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Aterian common stock during the Class Period.

117.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Aterian were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Aterian, their control over, and/or receipt and/or modification of Aterian's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Aterian, participated in the fraudulent scheme alleged herein.

118.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Aterian personnel to members of the investing public, including Plaintiffs and the Class.

119.    As a result of the foregoing, the market price of Aterian securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs

and the other members of the Class relied on the statements described above and/or the integrity of the market price of Aterian common stock during the Class Period in purchasing Aterian common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

120.    Had Plaintiffs and the other members of the Class been aware that the market price of Aterian common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Aterian common stock at the artificially inflated prices that they did, or at all.

121.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

122.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Aterian common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

123.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

124.    During the Class Period, the Individual Defendants participated in the operation and management of Aterian, and conducted and participated, directly and indirectly, in the conduct of Aterian's business affairs. Because of their senior positions, they knew the adverse non-public information about Aterian's misstatement of revenue and profit and false financial statements.

125.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Aterian's financial condition and results of operations, and to correct promptly any public statements issued by Aterian which had become materially false or misleading.

126.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Aterian disseminated in the marketplace during the Class Period concerning Aterian's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Aterian to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Aterian within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Aterian securities.

127.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Aterian.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating certifying Plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.


Dated: November 3, 2021                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           /s/ Jacob A. Goldberg
                                           Jacob A. Goldberg
                                           101 Greenwood Avenue, Suite 440
                                           Jenkintown, PA 19046
                                           Telephone: (215) 600-2817
                                           Fax: (212) 202-3827
                                           Email: jgoldberg@rosenlegal.com

                                           **THE ROSEN LAW FIRM, P.A.**
                                           Jing Chen
                                           275 Madison Avenue, 40th floor
                                           New York, NY 10016
                                           Telephone: (212) 686-1060
                                           Facsimile: (212) 202-3827
                                           Email: jchen@rosenlegal.com

                                           *Lead Counsel for Lead Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2021, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/Jacob A. Goldberg